**HAWAIIAN AIRLINES, Limited,**
v.
**The UNITED STATES.**
No. 144–52.

United States Court of Claims.
April 3, 1956.

As Amended June 5, 1956.

Motion to Amend Judgment Denied
June 5, 1956.

David L. Corbin, New York City, for plaintiff. Gallagher, Connor & Boland, Washington, D. C., Haight, Gardner, Poor & Havens, New York City, and Smith, Wild, Beebe & Cades, Honolulu, Hawaii, were on the briefs.

John R. Franklin, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

This case is before the court under a special act, the text of which is set out in finding 1.

It authorizes the court to hear, determine and render judgment on a claim for damages to a Douglas DC–3 airplane owned by plaintiff on June 16, 1942, caused by a United States Army plane during a takeoff while the Douglas plane was lawfully parked at the John Rodgers Airport in the Territory of Hawaii. Liability is to be determined "upon the same principles and measures of liability as in like cases between private parties."

Following the attack on Pearl Harbor on December 6, 1941, the Governor of Hawaii issued a proclamation placing all territorial airports under the control of the United States Armed Forces. Commercial airlines were permitted to continue operations to a restricted degree under the supervision of the Armed Forces.

The plaintiff had been operating as an inter-island air carrier since 1929, using the John Rodgers Airport as its starting

point. Before the proclamation the airport had been operated and maintained by the Department of Public Works of the Territory.

During the year 1942, the Army constructed a runway the first section of which was some 2,800 feet long, with a rock base, covered with sand rolled with an oil binder. None of it was paved. It had also added at the west end of the first section a 700- or 800-foot extension, made of coral and dirt fill. The use of the extension was restricted to military aircraft. Plaintiff's planes were permitted the use of only the first section.

The area in which plaintiff's DC-3 was parked at the time of the collision had been used continuously by the Hawaiian Airlines as a passenger-loading area since 1929. The nearby passenger terminal was a building owned by plaintiff. The building was separated from the loading area by a fence with a gate through which passengers could walk to the waiting aircraft.

Lines had been painted on the pavement to designate the proper parking position. Plaintiff's plane was within the designated area. It was not on or near the runway. Planes taking off on the runway and using the extension would miss the waiting plane by 200 to 300 feet. Fortunately loading had not started on plaintiff's plane at the time of the collision although it was scheduled to leave within a few minutes.

At about 8:00 a. m. on June 16, 1942, the army plane involved began its takeoff with a pilot, a copilot and several passengers who ware a part of the Army or civilian employees of the Army. They were to be flown to another part of the same island. The army plane was a C-33. The corresponding commercial plane of the same type was a DC-2.

After proceeding for about 800 feet in the line of the takeoff the left wheel of the airplane apparently struck a shallow pool of rainwater, collected on the runway. The airplane started turning to the left off the runway and toward the Hawaiian Airlines' passenger station and loading area where plaintiff's DC-3

was parked. At the time the army plane started to turn left the distance to where plaintiff's DC-3 was parked was still 900 to 1,000 feet, a distance greater than the plane had traveled after the beginning of the takeoff. The collision could have been avoided by immediately discontinuing the takeoff which would have enabled the plane to stop before reaching the DC-3.

Evidently the pilot's emphasis was on regaining the runway so as to continue his takeoff without interruption rather than stopping the plane and starting the takeoff anew. He increased the speed to about 75 miles and by applying full right brakes and rudder, advancing the left throttle and retarding the right throttle, attempted to control the plane and get it back on the runway. He did not succeed.

Soon after becoming airborne the landing gear and underside of the army plane hit the nose section of the DC-3 demolishing the cockpit and forward part of the fuselage and knocking the engine on the right side of the DC-3 from its mountings. The impact caused the army plane to crash to the cement pavement about 100 feet beyond the DC-3 in the direction of a building known as Hangar No. 2, the wing tip hitting an ambulance that was parked between the DC-3 and the hangar. Fire broke out immediately which resulted in the destruction of the army airplane. All the occupants succeeded in escaping without serious injury. The army plane probably would have crashed into the hangar if it had not been forced to the ground as a result of the collision.

At the time the wind was very light, being from the southeast at about 3 miles per hour, which is practically no wind. Under such conditions the pilot may choose his takeoff direction. The weather was good with no obstruction to visibility or to the army pilot's ability to observe the presence of plaintiff's DC-3 parked in front of the airline's passenger terminal. It had rained during the night and there were shallow puddles of water standing in various places along the surface of the runway and parking areas,

which was normal after a rain. It was customary and not regarded as unsafe to conduct operations with such puddles on the runway. Neither the pilot nor the copilot in the written statements which they prepared on the day of the accident referred to the presence of the puddles or as to the condition of the runway having caused or contributed to the accident. The pilot's subsequent statement to the Army Accident Classification Committee referred to the puddles without specifically assigning that condition as the cause of the accident. The pilot, however, at the hearing before the trial commissioner attributed the accident to the shallow puddle of water. The copilot did not do so.

Both the pilot and the copilot were second lieutenants, the pilot having had a total of 600 hours flying time, and the copilot about 400 hours. The copilot, however, had never flown a 2-engine aircraft.

The army pilot had authority, if he believed the takeoff could not be safely accomplished, to discontinue or abandon it, or he could have obtained permission to make the takeoff without using the runway extension.

The Army Accident Classification Committee made a report in which they absolved the pilot from any blame. For some reason at the time the investigation was made the Committee did not talk to nor secure the evidence of the officer who was in charge of the field.

█ The facts as disclosed by the record as a whole preclude any other reasonable conclusion than that the damages to the plaintiff's plane were the proximate result of the negligence of the defendant, its agents and servants.

The evidence justifies the conclusion that had the pilot exercised the care that an ordinarily prudent person would have exercised under the same or similar circumstances he could and would have stopped the plane within less than the 900 to 1,000 feet which still lay between him and plaintiff's plane at the time when the plane he was operating became diverted from the runway and when it was traveling at not more than 40 miles per hour; and that his failure to do so constituted negligence which was the direct and proximate cause of the injury. Neither the disputed puddle nor the other conditions that prevailed can adequately justify his failure to do so nor his continuing on his course and increasing his speed and striking a plane that was 200 to 300 feet to one side of the runway, unless the plane was in a non-flying condition due to defective brakes or other defective equipment, in which event there was negligence in the maintenance or operating department. The facts show a clear case of negligence whichever horn of the dilemma is taken. The doctrine of res ipsa loquitur would apply as between private parties. There is not anything approaching a satisfactory explanation, notwithstanding a defense that was skillfully presented.

There are no facts of record that could possibly justify a finding of contributory negligence or assumed risk. The premises were under the supervision of defendant and plaintiff was operating subject to defendant's rules. Plaintiff's plane was located at the customary loading grounds and where loading was being regularly done. It had no way of knowing of the pilot's skill or of the condition of the particular plane.

Section 6979 of the Revised Laws of Hawaii, 1935, which is set out in finding 22, makes the owner of a plane absolutely liable for damages to persons or property, in the absence of contributory negligence on the part of the owner or bailee of the property injured. However, since there is a clear case of negligence and an absence of contributory negligence, it is not necessary to invoke this statute, which is apparently the law of the Territory where the accident occurred.

█ The principal amount of the damages has been agreed upon, the sum being $71,550. The plaintiff asks for interest in view of the provisions of the special act. That act confers jurisdiction on this court

"to hear and determine such suit and to enter a judgment or decree for the amount of such damages, interest, and costs, if any shall be found to be due against the United States in favor of the said Hawaiian Airlines, Limited, upon the same principles and measures of liability as in like cases between private parties." 65 Stat. A100.

Subdivision (a) of section 2516 of Title 28, United States Code, is as follows:

"Interest on a claim against the United States shall be allowed in a judgment of the Court of Claims only under a contract or Act of Congress expressly providing for payment thereof."

It will be noted that the special act stipulates for such interest as may be found due against the United States, "upon the same principles and measures of liability as in like cases between private parties."

Since the special act does not make it clear that any judgment should provide for interest from the time when the damages occurred, interest will be allowed only from the date of judgment.

Judgment will be entered for plaintiff in the sum of $71,550, together with interest at the rate of 4 percent per annum from the date of final judgment.

It is so ordered.

LARAMORE, MADDEN, WHITAKER, and LITTLETON, Judges concur.

### Findings of Fact.

The court, having considered the evidence, the report of Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:

1. Plaintiff's petition was filed March 31, 1952, pursuant to the act of September 26, 1951, Private Law 264, chapter 418, 82d Congress, 1st session, 65 Stat. A100, which provides as follows:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the claim of the Hawaiian Airlines, Limited, of Honolulu, Hawaii, owner of a Douglas DC–3 airplane numbered NC–33607, for damages to said airplane alleged to have been caused on June 16, 1942, by the United States Army plane numbered 36–73 while said Douglas airplane was lawfully and properly parked at the John Rodgers Airport at Oahu, in the Territory of Hawaii, may be sued for by the said Hawaiian Airlines, Limited, in the Court of Claims of the United States sitting at Washington, District of Columbia, and such court shall have jurisdiction to hear and determine such suit and to enter a judgment or decree for the amount of such damages, interest, and costs, if any shall be found to be due against the United States in favor of the said Hawaiian Airlines, Limited, upon the same principles and measures of liability as in like cases between private parties: *Provided,* That such notice of suit shall be given to the Attorney General of the United States as may be provided by the order of said court, and it shall be the duty of the said Attorney General to appear and defend for the United States.

"Sec. 2. Suit upon such claim may be instituted at any time within one year after the date of the enactment of this Act, notwithstanding the lapse of time, laches, or any statute of limitations. Proceedings for the determination of such claim and appeals from, and payment of, any judgment thereon shall be had as in the case of claims over which such court has jurisdiction under chapter 91 of title 28, United States Code: *Provided,* That the passage of this Act shall not be construed as an inference of liability on the part of the United States Government.

"Approved September 26, 1951."

2. Plaintiff is a corporation incorporated under the laws of the Territory of

Hawaii, with its principal place of business at Honolulu, T. H., and has been engaged since 1929 as a scheduled air carrier within the Territory of Hawaii. The name under which plaintiff was originally incorporated was Inter-Island Airways, Limited, which was changed in October 1940, to Hawaiian Airlines, Limited.

3. On December 7, 1941, following the Japanese attack upon Pearl Harbor, the Governor of the Territory of Hawaii issued a proclamation placing the Territory under martial law and calling upon the Commanding General, Hawaiian Department, to exercise all the powers normally exercised by the Governor and the subordinate civil officers of the Territory. On the same day the Commanding General, Hawaiian Department, in compliance with the requests made by the Territorial Governor, assumed the position of military governor of Hawaii and took charge of the government of the Territory. The control and operation of all Territorial airports were immediately taken over by the Armed Forces, and such airfields as were considered vulnerable to attack were rendered unusable and the others were placed under strict control of either the Army or Navy, or both. Private civilian flying was suspended, and commercial airlines were allowed to continue operations to a restricted degree under the supervision of the Armed Forces.

4. The attack upon Pearl Harbor caused the temporary suspension of plaintiff's air carrier operations, which had been conducted since 1929 from the John Rodgers Airport (now called Honolulu International Airport), located on the outskirts of the city of Honolulu. On December 17, 1941, the Army assumed control of the plaintiff's air passenger transportation facilities pursuant to a directive entitled "New Series Operations Memorandum Number 1," which was issued by direction of the commanding officer of the U. S. Army Headquarters, Hickam Field, T. H., and was in full force and effect on June 16, 1942. Among other things, this directive specified that the plaintiff, operating in its normal capacity as a civilian airline, was to carry military passengers on a priority basis and listed certain flight schedules which were to be followed by the plaintiff whenever possible, including a DC–3 trip which was scheduled to depart daily from the John Rodgers Airport at 8:15 a. m., with stops at Maui, Hilo, and Maui before returning to the John Rodgers Airport. In continuing thereafter to operate under the aegis of the military authorities, plaintiff did not do so as a matter of volition, but pursuant to its understanding of the military requirements.

5. Prior to December 7, 1941, jurisdiction over the operation and maintenance of the John Rodgers Airport had been vested in the Department of Public Works of the Territory. After that date the Army, under the authority of the Commanding General, assumed control over the operation and maintenance of the airport to the exclusion of the Territorial authorities and continued to exercise such control as of June 1942, including the contracting for and directing of the project of enlarging and grading the runways and other improvements under supervision of the War Department Area Engineer, Tenth Field Area.

6. From about May 22 to October 15, 1942, the first phase of an extensive airport enlargement program was in progress at the John Rodgers Airport, under contracts let by the War Department. During all or most of this period heavy construction equipment was either in place or in use on the airfield filling, grading, and surfacing heavier and larger runways. Access roads across portions of the field and runways were used by construction vehicles.

7. At or about 8 a. m., on June 16, 1942, plaintiff's DC–3 airplane No. MC–33607, which was then standing unoccupied in the Hawaiian Airlines passenger-loading area for its scheduled 8:15 a. m. departure for Maui and Hilo, was struck and severely damaged by United States

Army airplane No. 36–73, while the latter was attempting to take off on a military transport mission.

8. The Army airplane, which was attached to the 19th Transport Squadron based at the John Rodgers Airport, was a twin-engined, transport-type aircraft known under the Army designation as a C–33 and under the corresponding commercial designation as a DC–2. At the time of the collision referred to in finding 7, the Army airplane was being operated by a regularly assigned Army Air Force pilot on a military mission under Army orders. The crew consisted of the pilot and copilot, a flight engineer, two radio operators, and ten military personnel as passengers.

9. Preparatory to the attempted takeoff of the Army airplane the pilot observed all the usual and normal precautions. He taxied out on the left side of the runway area to better observe, from the pilot's seat, the edge of the runway.

10. The general direction of the intended takeoff of the Army airplane was from west to east, on a heading which ran diagonally across the field toward the mountain area to the east of the John Rodgers Airport. The runway had been constructed by the Army subsequent to December 7, 1941. None of it was paved. The first section of it was about 2,800 feet in length, had a coral rock base, and was covered with sand rolled with an oil binder. To the west end of the first section the Army had added a 700- or 800-foot extension. The extension was made of a coral and dirt fill and was raised about two or three feet above the contiguous land. The extension, which was about 100 feet in width, was one-half the width of the first section. The surface of the combined runway was not maintained as smooth as might have been desired, but it was safe and airplanes taking off from the same runway on previous occasions had done so without difficulty. The use of the extension was restricted to military aircraft, and plaintiff's airplanes were permitted to use only the first section. The area of the first or original section of the runway provided adequate space for the daytime takeoff of a DC–2 with a gross takeoff load of under 24,400 pounds, which was greater than the gross takeoff load of the Army airplane.

11. The area in which plaintiff's DC–3 airplane was parked at the time of the accident had been used continuously by Hawaiian Airlines as a passenger-loading area since 1929. The passenger terminal was in a building owned by plaintiff known as Hangar No. 1, which had been occupied and used by plaintiff as a passenger terminal since 1929. The terminal itself was separated from the loading area by a fence and hedge through which there was a gate allowing the passengers to walk from the terminal to the waiting aircraft. Lines had been painted on the pavement of the loading area to designate the proper parking position. At the time of the accident plaintiff's DC–3 was properly parked with reference to those lines and in the normal position for loading passengers, with its left wing close to the fence separating the passenger terminal from the loading area. The DC–3 was not on or near the runway, and airplanes taking off on the runway and using the runway extension would clear the parking area by between 200 and 300 feet.

The degree of proximity of plaintiff's passenger terminal and parking area to the runway, and the presence of construction vehicles on the field constituted hazards to use of the runway, but plaintiff had not contributed to these hazards and the runway had been established under Army control. There is no evidence that either the Army or the Civil Aeronautics Administration representative had requested or directed plaintiff to move its parking area, hangar, or other structures elsewhere. The runway previously used by plaintiff had been a safe distance away from structures, but it was not useable at the time due to the Army's construction program.

12. As the Army airplane began its takeoff, the pilot was seated at the controls on the left side of the cockpit with the copilot on the right-hand side.

There were no other persons in the cockpit. After proceeding normally for approximately 800 feet in the line of takeoff the left wheel of the airplane struck a shallow pool of rainwater collected on the runway and, as a result, the airplane started turning to the left, off of the runway and toward the Hawaiian Airlines passenger terminal and loading area in which plaintiff's DC–3 was parked. The speed of the airplane, which had been about 40 miles per hour when it started to turn left off the runway, increased as it continued toward the passenger-loading area, and reached a maximum of about 70 or 75 miles per hour at the time of the impact with plaintiff's DC–3.

13. Before reaching the DC–3 the right wing tip of the Army airplane scraped the ground as the pilots collectively applied full right brakes, rudder, and right aileron, advanced the left throttle, and retarded the right throttle in an attempt to control the airplane and get it back on the runway. The normal and expected combined effect of these measures would have been to bank the airplane to the right, but either the speed of the airplane was too great or the controls not sufficiently responsive to achieve the desired effect in time to avert the collision. Shortly after becoming airborne the landing gear and underside of the Army airplane hit the nose section of the DC–3, demolishing the cockpit and forward part of the fuselage and knocking the engine on the right side of the DC–3 from its mountings. The impact caused the Army airplane to crash to the cement pavement about 100 feet beyond the DC–3 in the direction of a building known as Hangar No. 2, and as it crashed the wing tip hit an ambulance that was parked between the DC–3 and the hangar. Fire broke out immediately which resulted in the complete destruction of the Army airplane with the exception of the vertical stabilizer. All of the occupants succeeded in escaping without serious injury. In the direction in which it was traveling the Army airplane probably would have crashed into the hangar if it had not been forced to the ground as a result of the impact with the DC–3.

14. a. When the Army airplane started turning left off the runway after the takeoff began, the distance between the Army airplane and plaintiff's DC–3 was then approximately 900 to 1,000 feet, or more than the distance which the Army airplane had already traveled from the beginning of the takeoff to the point where the takeoff became abnormal. Corrective action was not taken as soon as it could have been taken to avoid the accident. At the speed of about 40 miles per hour which the Army airplane was traveling when it commenced to turn off the runway, the accident could have been avoided by immediately discontinuing the takeoff, which would have made it possible to bring the airplane to a stop before reaching the DC–3. It is reasonable to conclude from the combination of circumstances that the pilot's emphasis was on regaining the runway so as to continue his takeoff without interruption rather than on halting the airplane and commencing the takeoff anew.

b. The brake system of the DC–2 was of a design different from any other aircraft at the time, and less desirable in certain respects, but the evidence does not establish that its seasonable application would have failed to bring the Army airplane to a halt in time had the speed been reduced instead of accelerated. Preflight inspection of the Army airplane immediately prior to its takeoff indicated that its brakes were in serviceable condition. The brakes were not of a dual-control type, but were solely under the control of the pilot to the exclusion of the copilot. So far as was revealed by preflight inspection, and a more complete inspection one week earlier, the Army airplane was in normal operating condition at the time of its disaster.

15. At the time of the accident the wind was very light, being from the southeast at three miles per hour. A wind of less than four or five miles per hour is generally not reported as wind, and under such conditions the pilot may choose his takeoff direction. The weath-

er was good with no obstruction to visibility or to the Army pilot's ability to observe the presence of plaintiff's DC–3 airplane parked in front of the Hawaiian Airlines passenger terminal. It had rained during the night, and there were puddles of water standing in various places along the surface of the runway and parking areas, which was normal after a rain. It was customary and not normally unsafe to conduct operations with such puddles present on the runway. Neither the pilot nor the copilot of the Army airplane, in the written statements which they prepared on the day of the accident, referred to the presence of the puddles or to the physical condition of the runway as having caused or contributed to the accident. The pilot's subsequent statement of July 3, 1942, to the Army Accident Classification Committee referred to the puddles without specifically assigning that condition as the cause of the accident.

16. The Army pilot had authority, if he believed that the takeoff could not be safely accomplished, to discontinue or abandon it, or he could have obtained permission to make the takeoff without using the runway extension. According to the evidence of the Army pilot, if he had given consideration to whether or not it was safe to take off with the DC–3 parked where it was and had decided that it was unsafe, he probably would have asked to have the DC–3 moved, but he further testified that on this occasion he gave no consideration whatever to whether it was safe or unsafe.

17. The Army pilot, who was 24 years old at the time of the accident, had previously accumulated a total of approximately 100 hours of flying time on DC–2 aircraft of the type involved in the accident and a total of about 600 hours on all types of aircraft including his time in training. The Army copilot, whose total previous flying time, including his training, was approximately 400 hours, had never flown or qualified on this type of aircraft and had never previously flown any aircraft having more than one engine.

18. The damage to plaintiff's DC–3 airplane resulted from the failure of the defendant and its agents to exercise reasonable and proper care to prevent the Army airplane from turning off the runway during the course of the attempted takeoff or to bring the airplane to a stop after the takeoff became abnormal in order to avoid running into the parked DC–3. The damage to the DC–3 did not result from any failure by the plaintiff or its agents to exercise reasonable and proper care in parking the DC–3 and leaving it parked within the passenger-loading area at the time of the attempted takeoff of the Army airplane, or from any other fault or omission on their part.

19. The Army Accident Classification Committee appointed to investigate the accident found as follows:

(b) Handling qualities of the airplane, particularly on the ground, were poor due to age of the airplane and the unavailability of the necessary parts to correct the defects of the control system.

(c) The airport was in extremely poor condition for the operation of heavily loaded airplanes. Major construction work was being carried on at the time of the accident. This condition was amplified at the time of the accident by standing water in depressions from a recent heavy rain.

After carefully interviewing the principal competent witnesses and examining the other conditions surrounding this accident, the board believes that the pilot's technique was flawless.

In addition, it recommended that "The remaining C–33 airplanes in this Department be surveyed."

The evidence does not satisfactorily explain either the foregoing findings or the meaning of the recommendation. Nor was any further evidence presented to this court as to a shortage of parts for maintenance of defendant's DC–2.

20. The amount paid by the plaintiff as the reasonable cost of the repairs to its DC–3 airplane was $71,550, which amount also represents the diminution in the fair and reasonable value of the airplane. The expenses for the repairs totaling $71,550 as aforesaid were incurred and paid by plaintiff during the period from June 20, 1942, through May 24, 1943.

21. Plaintiff filed a claim with the War Department on October 29, 1943, for the cost of the repairs to its DC–3 airplane. Thereafter, by letter dated October 30, 1944, plaintiff was notified by the Office of The Judge Advocate General that $1,000 was the maximum amount which the War Department was authorized to pay in the administrative settlement of the claim (as provided by the act of July 3, 1943, 57 Stat. 372, 31 U.S.C.A. § 223b, as amended), and that plaintiff could obtain this amount only by signing a release of its entire claim. Plaintiff declined to accept the sum of $1,000 in settlement of its claim, and on November 12, 1945, it appealed to the Secretary of War. On January 7, 1947, plaintiff was advised by the War Department that it would not report the claim to Congress. Plaintiff then secured the introduction of legislation in Congress which culminated in the act set forth in finding 1.

22. The following statutes were in effect within the Territory of Hawaii as of the date of the accident, June 16, 1942:

Revised Laws of Hawaii, 1935, sec. 4049:

"*Torts, who may sue and for what.* Except as otherwise provided, all persons residing or being in the Territory shall be personally responsible in damages, for trespass or injury, whether direct or consequential, to the person or property of others, or to their wives, children under majority, or wards, by such offending party, or by his wife, or his child under majority, or by his command, or by his animals, domitae or ferae naturae; and the party aggrieved may prosecute therefor in the proper courts."

Revised Laws of Hawaii, 1935, sec. 6979:

*Damage on land.* The owner of every aircraft which is operated over the lands or waters of the Territory is absolutely liable for injuries to persons or property on the land or water beneath caused by the ascent, descent, or flight of the aircraft, or the dropping or falling of any object therefrom, whether the owner was negligent or not, unless the injury is caused in whole or in part by the negligence of the person injured, or of the owner or bailee of the property injured. If the aircraft is leased at the time of the injury to person or property, both owner and lessee shall be liable, and they may be sued jointly, or either or both of them may be sued separately. An aeronaut who is not the owner or lessee shall be liable only for the consequences of his own negligence. The injured person, or owner or bailee of injured property, shall have a lien on the aircraft causing the injury to the extent of the damage caused by the aircraft or objects falling from it."

Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States seventy-one thousand five hundred and fifty dollars ($71,550), together with interest at the rate of 4 percent per annum from the date of final judgment.